570 So.2d 69 (1990)
Nicholas MORCOS
v.
EMS, INC. d/b/a American Deck Machinery, Eaton Corporation and International Cargo Gear Bureau, Inc.
No. 89-CA-1766.
Court of Appeal of Louisiana, Fourth Circuit.
October 26, 1990.
*70 David B. Bernstein, New Orleans, for plaintiff-appellant.
Robert E. Barkley, Jr., Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler & Barkley, New Orleans, for defendant-appellee, Eaton Corp.
George E. Cain, John J. Hainkel, III, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for defendant-appellee, Intern. Cargo Gear Bureau, Inc.
Mary Campbell Hubbard, William L. Stroud, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for defendant-appellee, American Deck Machinery, Inc.
Before SCHOTT, C.J., and BARRY and LOBRANO, JJ.
BARRY, Judge.
This personal injury lawsuit involves negligence and strict liability claims which resulted in summary judgments granted to American Deck Machinery [ADM], Eaton Corporation, and International Cargo Gear Bureau [ICGB].

PROCEDURAL HISTORY
Nicholas Morcos alleged that while working for International Drilling Fluids, Inc. [IDF] he was told to paint six 20,000 gallon tanks which were horizontal in IDF's boat harbor. Morcos used an ADM diesel hydraulic crane to upright the tanks. After the tanks were vertical Morcos climbed to the top of the last tank to unshackle the slings when the boom slipped 12 to 18 inches. The shackles and sling struck Morcos and he fell and was injured.
Morcos sued Eaton, the distributor of the crane, ADM (formerly EMS, Inc.) which sold the crane to IDF (after buying it from the original owner, Berry Brothers), and ICGB, the company that tested the crane in October, 1985 and certified that it satisfied USDL/OSHA regulations. Morcos alleged that the defendants breached the implied and/or expressed warranties of merchantability and fitness of the crane.
Morcos amended his petition to include IDF and its compensation carrier and they *71 intervened to recover the paid benefits and medical expenses. That claim was compromised. Kathleen Morcos, divorced wife of Nicholas Morcos, intervened for past due child support.
ICGB's motion for summary judgment was denied October 24, 1988. After a hearing on December 5, 1988 the trial court granted summary judgment to Eaton Corporation (signed December 7, 1988) and to ADM (signed December 12, 1988). On December 19, 1988 Morcos filed for a new trial and the motion was denied on March 14, 1989.
On March 20, 1989 Morcos' motion and order for appeal of the March 14 judgment was granted. On March 27, 1989 Morcos filed for re-consideration of the denial of a new trial and the motion was denied June 21, 1989.[1] On July 5, 1989 Morcos' motion and order for appeal of the March 14 denial of his motion for new trial and the June 21 denial of his motion for reconsideration was granted.
On July 19, 1989 the trial court granted summary judgment to ICGB and on August 3, 1989 Morcos' motion and order for appeal was granted.

EATON'S MOTION TO DISMISS
Eaton filed a motion to dismiss the appeal and for sanctions because Morcos' appeal is procedurally deficient and his motion for new trial was untimely. La.C.C.P. Art. 2087 provides that an appeal must be taken within sixty days of the court's refusal to grant a timely application for a new trial. If the motion for new trial was untimely, Morcos' appeal as to Eaton is untimely.
Eaton's summary judgment was signed December 7, 1988 and Morcos filed for a new trial on December 19, 1988. La.C.C.P. Art. 1974 provides:
The delay for applying for a new trial shall be seven days, exclusive of legal holidays. Except as otherwise provided in the second paragraph hereof, this delay commences to run on the day after the judgment was signed.
When notice of the judgment is required under Article 1913, the delay for applying for a new trial commences to run on the day after the clerk has mailed, or the sheriff has served, the notice of judgment as required by Article 1913.
La.C.C.P. Art. 1913 provides in pertinent part:
If, at the conclusion of a trial a case is not taken under advisement but the court does not sign a judgment at the time, a party may make a request of record for notice of the date when the judgment was signed; and when such a request is made, the clerk shall mail such notice to the party requesting it or to his counsel of record.
The matter was not taken under advisement and judgment was granted from the bench on December 5, 1988. Morcos did not file a request for notice of judgment; therefore the delay commenced December 8, 1988. The motion for new trial on December 19, 1988 was untimely, therefore Morcos' appeal as to Eaton was untimely and will not be considered.
Eaton's motion to dismiss is granted. There is no basis to impose sanctions.

THE LAW
Summary judgment is a drastic remedy and should be granted only if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact, and the mover is entitled to judgment as a matter of law. La.C.C.P. Art. 966; Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980); Roger v. Dufrene, 553 So.2d 1106 (La.App. 4th Cir.1989), writ denied 559 So.2d 1358 (La.1990).
The party moving for a summary judgment must affirmatively and clearly prove the absence of a genuine issue of material *72 fact. Any doubt must be resolved against summary judgment and in favor of a trial on the merits. Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Company, 427 So.2d 1152 (La. 1983).
The movants' pleadings, affidavits and documents must be scrutinized closely; those of the opponent are to be indulgently treated. Supporting and opposing affidavits must be made on personal knowledge and set forth facts that would be admissible. La.C.C.P. Art. 967; Barham & Churchill v. Campbell & Associates, 503 So.2d 576 (La.App. 4th Cir.1987), writ denied, 503 So.2d 1018 (La.1987).

THE RECORD
By petition Morcos alleged strict liability and negligence theories as to ADM. He claimed that ICGB did not properly examine the crane and it should not have been certified under USDL/OSHA regulations. Morcos contended that ADM and ICGB breached the implied warranties of merchantability and fitness.
The record contains ICGB's first motion for summary judgment which included a number of exhibits: its contract with IDF to test the crane; certification of the crane; worksheets; IDF's application for certification to ICGB; the January 1, 1986 repair order for the crane; the deposition of Donald Rhea, president of ADM, and the affidavits of Lee Boutte and Rodolfo Mediavilla. Morcos filed a memorandum (and supplemental) in opposition and attached: the crane's act of sale to EMS; the ICGB documentation of testing; certification; a copy of several OSHA regulations; ICGB's contract; 2 ICGB's letters to IDF; pages from his deposition in which Morcos stated he first noticed the hydraulic leak four days after the crane's delivery to IDF and the boom started to slip in March or April, 1986. According to Morcos' brief at the hearing (at which the ICGB summary judgment was denied) he submitted the affidavit of Lubby Lodrigue, an IDF employee for eight and one-half months in 1987 who operated the crane on numerous occasions, in which Lodrigue stated in pertinent part:
4. While operating the crane, he found the boom to be unstable and considered the equipment to be very unsafe to operate.
5. That there exists a consensus among those that operated the Yale truck crane that it was/is `a piece of junk' and unreasonably dangerous to operate.
Morcos also submitted his affidavit which states:
1. That in October of 1986 he was an employee of International Drilling Fluids, Inc. and was working at their Venice, Louisiana facility.
2. That from his own experience with the crane, the boom was slipping during its earliest operation at International Drilling Fluids, Inc. This created a hazard to himself and the other crane operators.
3. On numerous occasions EMS, Inc., at the request of IDF, Inc., sent someone to the Venice, Louisiana facility to repair the crane.
ADM filed a motion for summary judgment arguing that it was not negligent as the seller or repairer of the crane and attached its repair tickets, affidavits and partial depositions.
In his affidavit Lee Boutte, a surveyor accredited by OSHA to inspect and test heavy industrial equipment, stated he inspected and witnessed the testing of the crane on October 7, 1985. He determined that the crane held the proof load of over 75,000 pounds without slippage of the boom. The crane conformed to all OSHA requirements, there was no defect, and a certificate was issued.
Roy Hayes, product assurance manager for Timberjack, Inc., Eaton's former forestry and construction equipment division, stated by affidavit that he was the manager of the group that designed and built the CM60 hydraulic truck crane which was manufactured and sold in 1976. Hayes, a mechanical engineer since 1958, and other engineers inspected and tested the crane before it left Eaton. All hydraulic and boom functions were examined, operated and load-tested. No design or manufacturing *73 defects were discovered. After the crane was sold to its first owner in October, 1976 there was no complaint of mechanical or hydraulic malfunction. On November 6, 1987 Hayes participated in an inspection of the crane and found no defect.
In his affidavit Rodolfo Mediavilla, a civil engineer specializing in industrial construction, said he inspected, tested, load-tested, and operated the crane in November, 1987. The crane was in good working condition and there was no indication that the crane was defectively designed. Mediavilla stated that loss of hydraulic fluid in the boom would cause it to lower in a slow, gradual descent and not drop quickly.
In several pages from his deposition Morcos stated contradictorily that the boom (even with no weight being held) was dropping in a jerking motion and there were hydraulic leaks.
In the part of his deposition Donald Rhea, president of ADM, testified that ADM continued to provide maintenance and repair work after selling the crane to IDF. The invoices showed electrical problems, oil pressure switch problems, and outrigger leg leak problems. No internal hydraulic leaks were present. Except for repacking the cyclinders prior to the IDF sale, he saw no problem with the hydraulic system. Rhea testified that during the time ADM owned and serviced the crane it was not defective and there was no indication the crane had been misused.
Donald Rhea's affidavit stated that EMS sold the crane to IDF on October 9, 1985. Lee Boutte had inspected the crane on October 7, 1985 and forwarded his report to ICGB which certified compliance with USDL/OSHA requirements. After the sale ADM repaired various subsystems, but not the hydraulic system. ADM replaced an eight foot hydraulic hose on one of the outriggers on January 4, 1986, but Rhea said an outrigger leak would not cause the boom to drop suddenly.
The repair tickets included the following: November 8, 1985electrical and starter problems;
November 13, 1985electrical and pressure switch problems;
December 4, 1985pressure switch and electrical problems;
January 4, 1986electrical problems, outrigger hose replacement, and installation of a pin on sheaves in front section of boom.
Eaton attached to its motion for summary judgment the same affidavits of Hayes, Boutte, Mediavilla. Eaton also attached parts of depositions including Morcos' one page in which he stated the crane's problem was that the boom drops and there are hydraulic leaks. Donald Rhea's deposition excerpt stated that he purchased the crane in 1985 and sold it. ADM checked the crane before purchasing it from Berry Brothers. ADM had no notice of a deficiency or mechanical problem. Rhea testified that before ADM sold the crane to IDF it installed a load indicator and repacked the cyclinders because the crane had electrical problems, but that problem had nothing to do with hydraulic leaks. He stated the crane had hydraulic leaks when it was purchased from Berry Brothers and such a system always has leaks. Rhea also said that ICGB load-tested the crane and it passed OSHA regulations and was certified.
Also attached was part of the deposition of Robert Klotzbach, IDF's regional manager, who testified that the crane had hydraulic leaks similar to all hydraulic machinery. He said there was no basis to suspect that a problem existed because of a manufacturing defect. Klotzbach stated that he had no knowledge of a deficiency in the hydraulic winch, boom sections, pivot point, or overload bypass valves.
We find no opposition to ADM's motion for summary judgment. After summary judgment was granted Morcos filed for a new trial and argued that he previously filed his affidavit and another from co-employee Lubby Lodrigue. He stated that he was seeking statements from co-employees but had not been able to obtain any at the time of the judgment. He claimed that IDF had not timely responded to interrogatories. He argued that the two affidavits *74 coupled with the admissions of ADM as to the repairs were sufficient to create a doubt that the crane was in good working condition.
The trial court denied the motion for new trial as to ADM and on March 27, 1989 Morcos filed a motion for reconsideration. He alleged that IDF failed to provide the names and addresses of former Yale truck crane operators until March, 1989. He obtained the address of Thomas Carline, a crane operator at IDF's Venice facility, whose statement was crucial to refute the defendants' experts. Morcos attached the affidavit of Tommy Carline employed at IDF from February 9, 1987 until August 8, 1988 and who was operating the crane when Morcos was injured. Carline states in pertinent part:
2. The Yale truck crane `was old, worn out junknothing but junk.' There was `no way it could pass certification.' Several features did not function at all. It would `throw' as much as 70 gallons of hydraulic fluid in a twenty-four hour period. The boom frequently slipped due to fluid leaking from the boom cylinders. Nothing worked properly on the crane. The angle indicators (which would tell you what angle your boom was at, and thus important in determining lifting capacity) were inoperable. It had no windshield wipers; the roof and floor boards had holes; the door wouldn't close; the lights for guages [sic] were not operation [sic]; it had no load indicators; the truck and operator's cab were totally rusted; approximately 80% of the hydraulic hoses leaked at any given time; there was an electrical short which required disconnecting the battery posts after each use; hydraulic had to be added while the crane was in operation, as pressure pushed it all out; and, the crane would leak hydraulic even when it was not being operated. The hydraulic system would suck in air at one end while blowing out fluid from the other, causing the boom to descend in a `jerky' manner.
3. The Yale truck crane `wasn't good for ten tons.' Even though it was a 60,000 lbs./30 ton crane, if you try to pick up 22,000 lbs. under perfect operable/boom conditions, the whole crane would lift up.
* * * * * *
5. The Yale truck crane was unsafe to operate.
Carline stated that he was employed by IDF when Roy Hayes and Rodolfo Mediavilla, defense experts, inspected the crane. He said their statements that the crane was in satisfactory operating condition were "absurdly false."
Morcos also attached part of his deposition which stated that the crane was an "old piece of machinery" when it was delivered to IDF and there was no guide book. Maintenance records were kept and ADM was called for maintenance. The crane failed to start many times and there was a constant hydraulic leak. ADM repeatedly "fixed" the engine but the problem continued.
Morcos first knew of an hydraulic leak from the outriggers on the side of the crane about four days after its delivery to IDF. ADM was continually notified. The leaking outrigger went slowly down and the crane was unbalanced. By March or April, 1986 the boom began to go down on its own in a jerking motion during a matter of minutes. ADM serviced the crane but Morcos did not know the result.
On the day of the accident Morcos moved the 20,000 gallon tanks from the truck and set them upright to paint. After the sixth tank was upright he climbed up the ladder and onto the tank to unhook the slings which were "stuck on the side." He went underneath the hook and the boom hit him on the head and he fell. There were no witnesses.
On May 30, 1989 ICGB filed another motion for summary judgment based on Morcos' failure to introduce any evidence that the crane was defective at the time of Lee Boutte's inspection or that ICGB had failed to fulfill its duty in issuing the certification. ICGB attached mostly the same supporting documentation and Morcos attached for the most part the same exhibits to his memo in opposition including the two affidavits (Morcos and Lodrigue). The trial *75 court granted ICGB's second motion for summary judgment.

ADM'S SUMMARY JUDGMENT
Morcos argues that Boutte's report is suspect because the sale of the crane from Berry Brothers to ADM and from ADM to IDF was contingent on it passing certification and inspection. Morcos contends that he noticed the boom slipping during early operations and his testimony is corroborated by Lodrigue and Carline. He said the slipping boom and large quantities of oil escaping from the boom's cylinders constituted a hazard. Morcos argues that ADM as a non-manufacturer vendor would be liable if it knew or should have known that the crane was defective. Since a determination of whether the defect is obvious and apparent is a fact or determination, he claims summary judgment was inappropriate.
Morcos contends ADM personnel repeatedly repaired the crane after the sale. He alleges that there is doubt as to the boom's condition during that period of time.
ADM responds that it saw the crane at Berry Brothers and purchased it on September 26, 1985 and sold it to IDF on October 9, 1985. It argues that Boutte inspected the crane and ICGB issued a certificate that the crane was in compliance with USDL/OSHA requirements. ADM submits that the crane was in perfect working order when it was sold to IDF.
Although Morcos filed the affidavit of Lubby Lodrigue, he was not an IDF employee until 1987 and then only for eight and a half months in 1987. He knew nothing about the condition of the crane when it was purchased by IDF in 1985 or when Morcos was allegedly injured on July 31, 1986. Tommy Carline, whose affidavit was not before the trial court on the ADM summary judgment (filed later on the motion to reconsider the denial of a new trial), did not work at IDF until February 9, 1987 and had no knowledge as to the crane's condition at the time of ADM's sale to IDF or at the time of the accident.
ADM presented expert affidavits and testimony as well as the crane's certificate and other documentation relating to its condition in October, 1985. Morcos filed no opposition. The record only contains Morcos' affidavit that he was an employee of IDF in October, 1985 (noted during oral argument by counsel that the affidavit mistakenly states 1986 when the correct year is 1985), that "the boom was slipping during its earliest operation" at IDF, and ADM repeatedly went to IDF's facility to repair the crane, and Lodrigue's affidavit as to the crane's condition in 1987. Morcos declares that he knew of the hydraulic leak in the outrigger leg about four days after its delivery to IDF in 1985. However, he states that the boom problem (jerking downward on its own) did not begin until March or April, 1986. Although the record contains only Morcos' statement as to the crane's condition in 1985, there remains an issue of material fact.
ADM undertook repair work from November, 1985 until January 4, 1986 which included starter problems, electrical problems, replacement of an outrigger hose, and placement of a sheave pin in the boom. The inordinate number of repairs made prior to the accident raises a genuine issue of material fact as to ADM's liability as a negligent repairer of the crane. Any doubt must be resolved against summary judgment.
The summary judgment in favor of ADM was clearly wrong and is reversed.

ICGB'S SUMMARY JUDGMENT
Morcos argues that ICGB's second summary judgment motion should have been denied. Morcos relies upon the affidavits of Lodrigue, Carline, and his affidavit which indicate that the boom was slipping during its earliest operations at IDF and was a hazard. Morcos also relies on his deposition which details the problems that he and other operators were experiencing. Morcos argues that ICGB's role in the accident was significant because employees must rely on the integrity and competency of certification inspectors to make their work safe.
*76 ICGB contends that its certification inspection is for the benefit of the employer IDFwho is required by U.S. Department of Labor regulations to provide equipment that has been certified. IDF contracted for ICGB's services. ICGB argues that the inspection on October 7, 1985 was only to certify the crane's condition at that time based on USDL regulations.
The company which inspects a piece of equipment for a hospital or employer pursuant to a contract generally owes no duty to a subsequently injured third party (patient or employee). See State v. Joint Commission on Accreditation of Hospitals, 470 So.2d 169 (La.App. 2d Cir.1985).[2] Prevention of risk of injury to employees would not fall within the ambit of the inspector's duty. See Kennard v. Liberty Mutual Insurance, 277 So.2d 170 (La.App. 1st Cir.1972).
ICGB's contract was to certify that the crane met OSHA regulations. It was not to make a safety inspection for the benefit of Morcos, an employee.
ICGB breached no duty to Morcos. Morcos did not introduce evidence that the tests by Boutte or his inspection were improper. Morcos made no clear showing as to the defective condition of the crane's boom at the time of the inspection in October, 1985. Although Morcos' affidavit (which incorrectly declared he worked at IDF from October, 1986 instead of 1985) stated the boom was slipping during its earliest IDF operation without specifying a date, his deposition testimony indicated only outrigger leg leaks about four days after the crane's delivery to IDF (sale was October 9, 1985). He testified that the boom began to slip in March or April, 1986. Regardless, without a duty breached, there can be no liability.
The summary judgment as to ICGB is affirmed.
The appeal as to Eaton Corporation is dismissed. The summary judgment in favor of ADM is reversed. The summary judgment in favor of ICGB is affirmed.
EATON'S MOTION TO DISMISS GRANTED; REVERSED IN PART; AFFIRMED IN PART.
SCHOTT, C.J., concurs in part and dissents in part.
SCHOTT, Chief Judge, concurring in part and dissenting in part:
As to the dismissal of plaintiff's appeal from Eaton's summary judgment I agree with Judge Barry's opinion.
As to the summary judgment in favor of ADM I concur in the result reached by my colleagues. Summary judgment is appropriate only when the pleadings, affidavits, depositions, and other documents show that there is no genuine issue of material fact and that mover is entitled to a judgment under the law. C.C.P. art. 966. Where the opponent's documents raise any reasonable doubt about the presence of an issue of material fact that doubt is resolved against the mover. The court may not grant the motion because the opponent seems to have little chance to succeed at trial.
In the light of these principles the summary judgment in favor of ADM was erroneously granted. In his affidavit and deposition Morcos stated that this crane was leaking just four days after it was delivered, the boom began to slip in March or April, 1986, and the problem continued until the accident occurred, despite numerous attempts by ADM to repair it. This is sufficient to raise an issue as to ADM's liability in its role as the repairer of the crane.
As to ICGB, I do not agree with Judge Barry as to an absence of issues of material fact such as to compel the conclusion that ICGB breached no duty to Morcos. Morcos' affidavit and deposition cast doubt on the quality of ICGB's inspection of the crane. From the fact that the crane was leaking four days after the inspection, some reasonable doubt emerges as to the *77 crane's condition when it was inspected. Also significant in this regard is ADM's Rhea's statement that this type of crane always leaks.
State v. Joint Commission on Accreditation of Hospitals, 470 So.2d 169 (La.App. 2d Cir. 1985) is distinguishable. The inspection there was in connection with a voluntary program of accreditation. If the hospital wanted to be accredited it had to obtain a certificate from the agency based on whatever criteria the agency adopted. In the present case the inspection of the crane was performed in compliance with federal law and regulations. One of the primary reasons for these is to insure safety in the workplace. I am unable to conclude on the basis of this record that a negligent inspection cannot provide a basis for liability in favor of an injured workman.
Consequently, I would reverse the summary judgment in favor of ICGB and remand the case for trial against this defendant along with ADM.
NOTES
[1] We note that the trial court was divested of jurisdiction as to the summary judgments of Eaton and ADM when the appeal was granted on March 20, 1988. La.C.C.P. Art. 2088. There is no provision in the Code of Civil Procedure for reconsideration of the denial of a motion for new trial.
[2] A company that contracts to inspect equipment may owe a duty to third parties if the contract contains a "stipulation pour autrui" which would give rise to such a duty. La.C.C. Arts. 1978 and 1985.