| LUIGI MALTA, | * | NO. 2020-CA-0250 |
| INDIVIDUALLY AND ON | | |
| BEHALF OF HIS MINOR | * | |
| CHILD, GIOVANNI MALTA | | COURT OF APPEAL |
| | * | |
| VERSUS | | FOURTH CIRCUIT |
| | * | |
| HERBERT S. HILLER | | STATE OF LOUISIANA |
| CORPORATION, HILLER | * * * * * * * | |
| OFFSHORE SERVICES, INC., | | |
| THE HILLER COMPANIES, | | |
| INC., HELIS ENERGY, L.L.C. | | |
| AND HELIS ENTERPRISES, | | |
| INC. | | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2013-01264, DIVISION "C"
Honorable Sidney H. Cates, Judge
* * * * * *
**Judge Terri F. Love**
* * * * * *

(Court composed of Judge Terri F. Love, Judge Daniel L. Dysart, Judge Rosemary Ledet)

**DYSART, J., CONCURS IN PART AND DISSENTS IN PART**

Al J. Robert, Jr.
LAW OFFICE OF AL J. ROBERT, JR., LLC
757 Saint Charles Ave., Suite 301
New Orleans, LA 70130

and

Timothy John Falcon
Jeremiah A. Sprague
Jarrett S. Falcon
FALCON LAW FIRM
5044 Lapalco Boulevard
Marrero, LA 70072

    COUNSEL FOR PLAINTIFFS/APPELLEES

Andrew Charles Wilson
Cody J. Acosta
Maura E. Bowlin
MILLING BENSON WOODWARD, LLP
68031 Capital Trace Road
Mandeville, LA 70471

COUNSEL FOR DEFENDANTS/APPELLANTS

**AFFIRMED AS AMENDED**
**November 25, 2020**

Defendants Hebert S. Hiller Corporation, Hiller Offshore Services, Inc., and The Hiller Companies, Inc., (collectively "Hiller") appeal the trial court's judgment in favor of Plaintiff Luigi Malta, individually, and on behalf of his minor son, Giovanni Malta for injuries Mr. Malta sustained after a fire suppressant cylinder discharged. In addition, Mr. Malta answers the appeal, seeking a modification of the trial court's final judgment awarding damages. On appellate review, we find no manifest error that requires reversal of the trial court's judgment assessing 100% of the fault to Hiller. Likewise, we find no abuse of the trial court's discretion in its award of damages. However, we amend the trial court's judgment to clarify the manner by which credits are to be assessed for lost wages and medical expenses. Accordingly, we affirm the trial court's judgment as amended.

### PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The instant case arises from injuries Mr. Malta sustained in April 2012, when a high-pressure fire suppressant cylinder discharged as Mr. Malta was picking the cylinder up while he was working on a fixed oil production platform in

1

the Gulf of Mexico.

Wood Group Production Services ("Wood Group") was contractor for Helis Oil & Gas Company, L.L.C. ("Helis"), which owns and operates oil and gas facilities across the United States. Wood Group operates many of Helis' facilities, including Helis' Black Bay Central Facility[1], the offshore platform where Mr. Malta was injured. Wood Group employed Mr. Malta as a warehousemen at the Central Facility. His responsibilities on the platform included shipping, receiving, warehousing, and dispatching tools and supplies to the workers on the surrounding platforms.

Helis also contracted with Hiller, a fire protection company, to ensure the fire suppression systems that protect its oil rigs were properly inspected, serviced and maintained. Helis entered into a Master Service Agreement with Hiller, in 1998, wherein Hiller would perform annual inspections of Helis' facilities, including the Black Bay Facility. As part of the annual inspections, a Hiller technician would conduct the inspection, provide a report of the technician's findings and deficiencies, and meet with Wood Group to review the findings.

In April 2012, Hiller sent safety inspector Drey Hebert ("Mr. Hebert") to conduct a series of scheduled fire safety and equipment inspections at Helis' Black Bay Facility. Mr. Hebert testified that he had worked for Hiller for about a year when Hiller arranged for him to conduct the annual inspection at the Black Bay

---

[1] The Black Bay Central Facility is surrounded by 16 satellite platforms that together provide support services for Helis' Black Bay oil and gas production. *See Wood Group Production Servs.v. Director, Office of Worker's Compensation Programs, et al.*, 920 F.3d 733, 735 (5th Cir. 2019).

Facility. He further noted that it was his first inspection at the facility, but that he was familiar with the type of system used at the Black Bay Facility and "knew what needed to be done." Mr. Hebert spent three days inspecting Helis' fire suppression systems, including a clean agent system in a generator building on Helis' West Central Battery. This system holds two clean agent cylinders. Each cylinder contained a highly pressurized liquefied chemical fire retardant referred to as "Clean Agent." The fire suppression system is designed so that when a fire is detected, the cylinders release the Clean Agent into the system at high pressure, which is then sprayed onto the platform extinguishing the fire.

Mr. Hebert inspected and certified one of those cylinders as having "0 PSI" (pounds per square inch) based on his observation of the cylinder's pressure gauge. In light of his finding that the cylinder was no longer pressurized, having a 0 PSI, Mr. Hebert red tagged the cylinder as such in order for it to be "sent in for recharging." Mr. Hebert prepared the Clean Agent Cylinder Report and the Deficiencies report in connection with his inspection. Mr. Hebert noted in his report that a cylinder is "Stamped Full," when the cylinder and its contents weigh 244 pounds. The report further indicated that an empty cylinder weighs 110 pounds, and 134 pounds of agent is required for the cylinder to be full. According to the report, however, the cylinder in this case was over-filled. The Clean Agent Report shows that the "Actual Full" of the cylinder weighed 245 pounds and the "Actual Agent" weighed 135 pounds. The Clean Agent Report also notes in the comments section, "Cylinder has 0 PSI." Additionally, in his deficiencies report,

Mr. Hebert indicated that the subject cylinder had 0 PSI and "need[ed] to be sent in for recharge." Mr. Hebert provided Wood Group, the operator of the platform, with the documentation certifying that the cylinder had 0 PSI. Moreover, according to witness testimony presented at trial, Mr. Hebert advised Wood Group employees, including Mr. Malta and Wood Group's foreman Lilton Harvey ("Mr. Harvey"), that the cylinder was empty.

According to Mr. Harvey, on April 14, 2012, following a safety meeting in which Mr. Hebert's reports were discussed, Mr. Harvey instructed John Lowery ("Mr. Lowery"), an offshore electrician for Wood Group, to remove the cylinder so that it could be sent in for recharging. The cylinder was removed from the system, taken out of the generator building, lowered into a lift boat by crane, brought to the Black Bay Central Facility, and unloaded by another crane at that location onto the warehouse platform. Mr. Malta received radio instructions that a cylinder was coming that needed unloading from the crane's cargo basket. Once the cargo basket reached the warehouse platform, Mr. Malta guided the basket to the deck. Mr. Malta then "bear-hugged the cylinder" to remove it from the cargo basket. At trial, Mr. Malta testified that he put the cylinder down on the grating, he "attempted to pull it back and draw it on its access [sic] so [he could] roll the bottle to a staging area," at which point the cylinder began to hiss. He tried to push it out of the way, but it "went ballistic" and started spinning. The cylinder struck Mr. Malta, who sustained numerous injuries, some of which required surgery.

In February 2013, Mr. Malta filed a petition for damages against Hiller and

Helis, Helis Energy, L.L.C., and Helis Enterprises, Inc., for the personal injuries he sustained after the cylinder unexpectedly discharged.[2] Mr. Malta also filed suit on behalf of his minor son, Giovanni Malta, based on a loss of consortium claim.

Mr. Malta's original petition alleged that Helis had custody and control of the defective cylinder and that employees of Helis and Hiller breached duties owed to Mr. Malta.[3] The petition further alleged that Hiller: (1) failed to "properly determine that the cylinder was empty;" (2) "improperly mark[ed] the cylinder as empty;" (3) failed "to ensure that [the] cylinder was in proper working order;" and (4) failed "to warn [Mr. Malta] of any danger posed by the cylinder."

In November 2017, Ace American Insurance Company ("Ace"), the worker's compensation insurer for Wood Group, intervened in the action. Ace sought to recover worker's compensation and/or longshore benefits, medical benefits, and indemnity payments it made to or on Mr. Malta's behalf, totaling $241,071.92.

In March 2019, this matter proceeded to bench trial. The trial court rendered judgment in favor of Mr. Malta and against Hiller. The trial court assessed all fault for the incident against Hiller and awarded Mr. Malta the following damages: $1,000,000 in general damages for physical injury; $350,000 in general damages for psychological injury; $154,903.43 in past medical expenses; $300,000 in

---

[2] Helis Energy, L.L.C. and Helis Enterprises, Inc. were dismissed by joint motion in June 2013.

[3] Mr. Malta amended his petition in February 2015 to add his employer Wood Group as a defendant seeking damages for Wood Group's retaliation in refusing to rehire him. Wood Group filed a declinatory exception of improper venue that the trial court denied. Following review by this Court, the Louisiana Supreme Court considered the issue, finding the venue was improper in Orleans Parish and ordered the matter transferred to a court of proper venue. *See Malta v. Herbert S. Hiller, et al.*, unpub., 15-CC-1444 (La. 10/30/15).

damages for lost wages and future earning capacity; and $27,053.58 in damages for future medical expenses. Additionally, the judgment awarded Ace $241,071.92[4] and awarded Giovanni Malta $50,000.

Hiller subsequently filed a motion to alter or to amend the judgment, or in the alternative a motion for new trial on grounds that under Louisiana law, a worker's compensation carrier's recovery is from an injured employee and not a third party tortfeasor, so as to avoid a double recovery. Therefore, Hiller averred that the judgment improperly awarded Ace damages against it, rather than Mr. Malta. A hearing on Hiller's motion was held, and the trial court issued an amended judgment on January 10, 2020, by adding language that the damages awarded to Mr. Malta are "subject to a credit of amounts previously paid to and received by [Mr. Malta]." The trial court also amended the award as it relates to Ace as follows:

> IT IS FURTHERED ORDERED, ADJUDGED AND DECREED that there be judgment in favor of ACE. . . as the worker's compensation intervenor in this case for amounts previously paid to [Mr. Malta], against defendant Hiller in the amount of . . . $241, 071.92, together with judicial interest from date of demand until paid and all costs of these proceedings.

Hiller files the instant appeal seeking this Court's review of the trial court's amended judgment. Mr. Malta also files an answer to the appeal, seeking modification of the trial court's amended judgment, to which Hiller has filed a motion to dismiss.

## STANDARD OF REVIEW

---

[4] The parties stipulated, prior to trial, that Ace paid workers compensation benefits to or on behalf of Mr. Malta, totaling $241,071.92, as a result of the incident and resulting injuries alleged in the main demand.

The appellate court reviews a trial court's findings of fact using the manifestly erroneous or clearly wrong standard of review. *Ridgel v. Chevalier*, 19-0250, p. 9 (La App. 4 Cir. 1/8/19), 288 So.3d 192, 199 (quoting *Keller v. Monteleon Hotel*, 09-1327, p. 2 (La. App. 4 Cir. 6/23/10), 43 So.3d 1041, 1043). "[A] factual finding cannot be set aside unless the appellate court finds the trier of fact's determination is manifestly erroneous or clearly wrong." *John Begnaud Elec. Motors, Inc. v. Alternative Well Intervention, LLC*, 17-0548, p. 3 (La. App. 4 Cir. 12/20/17), 234 So.3d 269, 272 (quoting *Detraz v. Lee*, 05-1263, p. 7 (La. 1/17/07), 950 So.2d 557, 561).

This Court further explained, "the issue before the court of appeal is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Begnaud*, 17-0548, p. 3, 234 So.3d at 272 (quoting *Snider v. Louisiana Med. Mut. Ins. Co.,* 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323). "The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently." *Id.* Moreover, "[w]here the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." *Id.*

Hiller raises several assignments of error as it relates to the trial court's determination of fault. Hiller avers the trial court erred in allocating all fault for Mr. Malta's injuries against it. Specifically, Hiller contends the trial court erred when it: (1) found Hiller owed a duty to Mr. Malta to prevent the accident; (2) found Hiller was negligent; (3) found "Hiller's actions were the sole cause-in-fact . . . [and] erred as matter of law [found] that Hiller's actions were the sole proximate cause of [Mr. Malta's] accident;" and (4) failed to apply Louisiana's

7

comparative fault scheme pursuant to La. C.C. art. 2323 and assess fault to Wood Group, Mr. Malta, and Helis. In addition to Hiller's assigned errors on the issue of liability, Hiller assigns as error that the trial court's general damages award is excessive.

### *DISCUSSION*

The central issue on review is whether Hiller is liable for the physical and psychological injuries Mr. Malta sustained after a fire suppressant cylinder discharged. Pursuant to La. C.C. art. 2315, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Louisiana has adopted a duty/risk analysis in determining whether liability exists under a particular set of facts. *Posecai v. Wal-Mart Stores, Inc.*, 99-1222, p. 4 (La. 11/30/99), 752 So. 2d 762, 765. Under the duty/risk analysis, the plaintiff must prove: (1) "the conduct in question was the cause-in-fact of the resulting harm;" (2) "the defendant owed a duty of care to the plaintiff;" (3) "the requisite duty was breached by the defendant;" and (4) the risk of harm was within the scope of protection afforded by the duty breached." *Id.* (citing *Syrie v. Schilhab*, 96-1027, p. 4-5 (La. 5/20/97), 693 So.2d 1173, 1176-77).

### *Duty of Care*

The "threshold issue in any negligence action is whether the defendant owed the plaintiff a duty." *Id.*, 99-1222, p. 4, 752 So. 2d at 766 (citing *Meany v. Meany*, 94-0251, p. 6 (La. 7/5/94), 639 So.2d 229, 233). "Whether a duty is owed is a question of law." *Id.* (citing *Peterson v. Gibraltar Sav. & Loan*, 98-1601, 98-1609, p. 7 (La. 5/18/99), 733 So.2d 1198, 1204). Hiller avers that it owed no duty to Mr. Malta. Specifically, Hiller claims "as an inspection company no duty is owed to after an inspection to subsequently injured parties." Hiller cites *Morcos v. EMS,*

8

*Inc.*, 570 So.2d 69 (La. App. 4th Cir. 1990) in support for its contention. In *Morcos*, an employee was injured while using a crane to complete painting work of six 20,000-gallon tanks located in his employer's boat harbor. *Id.* at 70. Among the defendants the plaintiff employee sued was the company responsible for testing the crane and certifying compliance with USDL/OSHA regulations. *Id.* The plaintiff employee claimed that the company had breached implied and expressed warranties of merchantability and fitness. *Id.* This Court found "[t]he company which inspects a piece of equipment for a hospital or employer pursuant to a contract generally owes no duty to a subsequently injured third party (patient or employee)." *Id.* at 76. This Court concluded that the "contract was to certify that the crane met OSHA regulations. It was not to make a safety inspection for the benefit of [plaintiff], an employee." *Id.* Moreover, in affirming summary judgment this Court noted that there was no evidence that the crane was defective or failed to comply with federal safety standards.

We find *Morcos* distinguishable. Helis hired Hiller to conduct inspections specifically designed to identify deficiencies in its safety equipment, including the fire suppressant equipment. Additionally, Hiller's employees and experts testified that Mr. Hebert had a duty to conduct a competent inspection and accurately report the results from the inspection. In that the equipment at issue was specifically used for safety purposes, we find Hiller had a duty to competently perform a safety inspection.

### Breach of Duty

As explained, Hiller had a duty to conduct a proper safety inspection. Hiller's duty also included the requirement to report its findings from the inspection accurately. Thus, the next inquiry in the duty/risk analysis is

9

determining whether Hiller's conduct conformed to the appropriate standard. Mr. Malta notes in brief to this Court that Mr. Hebert's own Clean Agent Cylinder Report establishes his failure to "properly diagnose and report the status of the Generator #1 cylinder." The report indicates that the cylinder is "Stamped Full" when the weight of the cylinder is 244 pounds. Based on Mr. Hebert's liquid level measurements and calculations, Mr. Hebert noted the cylinder weighed 245 pounds. Yet, Mr. Hebert noted in his Clean Agent Cylinder report that the cylinder "ha[d] 0 PSI" and similarly, noted in his Deficiencies Report that the "cylinder has 0 PSI and needs to be sent in for recharge."

David Stahl, Mr. Malta's expert in fire protection maintenance practices, testified regarding the significance of this discrepancy. According to Mr. Stahl, the cylinder in question contained four to four and one half pounds of nitrogen based on Mr. Hebert's calculations. Mr. Stahl explained that when Mr. Hebert determined that the cylinder contained 135 pounds of agent, he should have recognized that the cylinder was "fully charged." Thus, a fully charged cylinder, containing 135 pounds of agent, cannot have 0 PSI. Mr. Stahl testified that based on these measurements Mr. Hebert should have recognized that the cylinder had a faulty gauge. Mr. Stahl testified, and Hiller's operations manager James Guidry ("Mr. Guidry") agreed, that the error was in stating that the cylinder had 0 PSI, as opposed to the gauge reflecting 0 PSI.

Hiller's own expert James Brast ("Mr. Brast") also testified that Mr. Hebert should have recognized that the situation involved a faulty gauge. Mr. Brast further stated that Mr. Hebert should have advised Wood Group that the gauge could be faulty and the cylinder was still pressurized. Nevertheless, Mr. Hebert reported his findings to Wood Group but failed to warn of the possibility of a

10

defective gauge and that the cylinder was still fully pressurized. Mr. Hebert's report made erroneous conclusions, which Mr. Hebert further communicated to Wood Group employees. In his failure to conduct a proper inspection and accurately report his findings, Mr. Hebert gave Wood Group an incorrect impression that the cylinder at issue was empty and no longer pressurized. Therefore, we find no error in the trial court's determination that Hiller breached its duty to provide complete and accurate information in this case.

***Cause in Fact***

We next turn to whether Hiller's breach was the cause in fact of Mr. Malta's injuries. This Court has previously explained, "'the cause need not be the sole cause, but it must be a cause in fact, and to be a cause in fact it must have a proximate relation to the harm which occurs and it must be substantial in nature.'" *Chanthasalo v. Deshotel*, 17-0521, p. 9 (La. App. 4 Cir. 12/27/17), 234 So.3d 1103, 1109.

As noted above, Mr. Hebert documented and certified in his Clean Agent Cylinder Report that the cylinder had 0 PSI. In the trial court's written reasons for judgment, the trial court noted "Lilton Harvey testified that Mr. Hebert specifically told him that the cylinder was empty." A review of the trial transcript does not indicate Mr. Harvey offered the testimony the trial court attributes to him. However, Mr. Harvey did testify that he relied on Mr. Hebert's report indicating that the cylinder had 0 PSI and needed to be sent in for recharging. He explained that in the past Wood Group experienced problems with cylinders mistakenly discharging without a fire being present. In those instances, the cylinders would be empty and Wood Group would remove them. Therefore, when Mr. Harvey reviewed Mr. Hebert's report indicating that the cylinder in this case had 0 PSI, he

11

believed that the cylinder had erroneously discharged, like others had in the past, and was empty. While Mr. Harvey signed off on the Clean Agent Cylinder Report containing the aforementioned error, Mr. Harvey testified that no one with Hiller suggested that the cylinder was still under pressure. In fact, he stated that if Hiller had represented to him that the cylinder might still be under pressure, he would not have instructed Wood Group employees to remove it. Mr. Harvey testified that he would have had Hiller handle the removal of the cylinder. Based on Mr. Hebert's representation that the cylinder had 0 PSI, and thus, needed to be sent in for recharging, Mr. Harvey determined that Wood Group could remove and transport the cylinder.

Testimony was presented at trial that Mr. Hebert communicated directly with several other Wood Group employees that the cylinder was empty. Mr. Lowery, an offshore electrician for Wood Group, accompanied Mr. Hebert during his inspection of the facility. Mr. Lowery testified that Mr. Hebert told him that the cylinder was empty. Mr. Lowery later represented to Donald Crain, another Wood Group employee, that the cylinder was empty. Mr. Malta also testified that he spoke with Mr. Hebert and that Mr. Hebert informed Mr. Malta that the cylinder was "certified and deemed empty with zero pressure."

The evidenced adduced at trial established that had Wood Group employees believed the cylinder was still pressurized, it would have had Hiller remove and transport the cylinder. However, Wood Group relied Mr. Hebert's representations that the cylinder had 0 PSI and/or that the cylinder was empty when it decided to remove and transport the cylinder itself. The trial court therefore could have reasonably concluded that Mr. Hebert's failure to report his findings accurately was the cause in fact of Mr. Malta's injuries.

12

*Proximate Cause*

We address next the fourth element of the duty/risk analysis—scope of protection or legal cause. Louisiana courts have explained:

> The essence of the ... inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the [duty]. It is a hazard problem. Specifically, it involves a determination of whether the ... duty ... [was] designed, at least in part, to afford protection to the class of claimants of which the plaintiff is a member from the hazard [encountered].

*Chanthasalo*, 17-0521, p. 7, 234 So. 3d at 1108 (quoting *Peterson v. Doe*, 94-1013, p. 8 (La. App. 4 Cir. 12/15/94), 647 So.2d 1288, 1293). To determine whether a duty/risk relationship exists between Hiller's substandard conduct and Mr. Malta's injuries, our "jurisprudence employs an ease of association analysis to assess liability." *Id.*, 17-0521, p. 8, 234 So.3d at 1108. "The ease of association inquiry asks: How easily does one associate the plaintiff's complained-of harm with the defendant's conduct? ... Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." *Id.*, 17-0521, p. 8, 234 So. 3d at 1109 (internal citations omitted).

Hiller claims "simply identifying a cylinder as being in need of service" is too remote from Mr. Malta's accident for the trial court to consider it the proximate cause of Mr. Malta's injuries. Instead, Hiller contends that Wood Group's improper handling of the cylinder caused Mr. Malta's injuries. In support of its argument at trial, Hiller pointed to the general industry practice that when removing and transporting a cylinder, workers should always treat it as if it was pressurized.

Mr. Malta, however, avers that there is an ease of association between the negligence of Mr. Herbert and Mr. Malta's injuries because it is "readily

13

foreseeable that someone might get hurt due to Mr. Hebert's negligence if it results in a high-pressure cylinder unexpectedly discharging." In other words, Mr. Hebert's expertise and training "is squarely within the scope of protection provided by [Hiller]'s services—providing competent inspections and accurately reporting the associated results."

Mr. Stahl testified that if individuals lack training in the proper usage of high-pressure cylinders there are risks that they are unaware of and that those risks are foreseeable. When questioned further, Mr. Stahl confirmed that because of the associated risks companies, like Helis, hire licensed experts to inspect these systems, providing advice and reports on their findings.

Moreover, Hiller's operation manager James Guidry ("Mr. Guidry") testified that it is Hiller's responsibility to provide accurate information to its customers. He also confirmed that Hiller was in the "best position to remove and transport" the type of cylinder at issue in this case. If the customer elects to remove and transport the cylinder, he stated that Hiller should warn of the associated hazards and risks and ensure that the customer knows how to do it safely. Moreover, Mr. Guidry agreed that discussing the risks involved with removing and transporting these types of cylinders is important because "it is foreseeable that, if someone doesn't know what they're doing, somebody could get hurt or killed."

In trying to create distance between itself and Mr. Malta's injuries, Hiller's characterization of its conduct is misleading. As noted earlier, the error was not in Hiller's identifying a cylinder as being in need of service, but that Mr. Hebert's report erroneously indicated that the cylinder had 0 PSI, rather than that the gauge read 0 PSI. Witnesses at trial noted that Mr. Hebert should have recognized that the cylinder had a faulty gauge. Yet, Mr. Hebert made express representations to

14

Wood Group personnel that the cylinder was empty.

The trial court determined that Wood Group relied on Mr. Hebert's inaccurate reporting and express representations when it elected to remove and transport the cylinder itself. The events that transpired after Mr. Hebert performed his inspection were readily foreseeable. Wood Group believed that it was removing an empty cylinder, so it is foreseeable that Mr. Harvey would instruct Mr. Lowery to disconnect and transport the cylinder. Given Mr. Hebert certified the cylinder as empty and had informed Mr. Lowery that it was empty, it is foreseeable that Mr. Lowery would "not have had reservations" about disconnecting and transporting the cylinder. Mr. Hebert advised Mr. Malta that the cylinder was empty, it is foreseeable that Mr. Malta would not see a reason to issue a stop-work order and seek help relocating the cylinder once it was removed from the cargo basket. While evidence was presented that Wood Group lacked the training to handle the cylinder that was erroneously certified as having 0 PSI, the trial court found that Wood Group relied on the expertise of Mr. Hebert when it undertook the removal and transport of the cylinder. Therefore, we find the evidence supports a finding that the risk and harm Wood Group encountered fell squarely within the scope of protection of Hiller's duty to provide competent inspections and accurate reporting.

### *Premises Liability*

Before we address Hiller's comparative fault argument, we first consider Hiller's claim that Helis is liable for Mr. Malta's injuries under La. C.C. art. 2317.1, which states in pertinent part:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the

15

ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

It is undisputed that Wood Group had complete control over the operations at the Black Bay facility, and Helis had no employees on site. Mr. Harvey testified that Wood Group was the sole operator of the facility and therefore had complete authority over it. Similarly, Wood Group's control room operator testified that Helis did not supervise the day to day operations of Wood Group. Further, there is no evidence to establish that the cylinder was damaged by ruin, vice or defect, or that Helis knew or should have known about it. The only evidence presented at trial of a vice or defect was the faulty pressure gauge. Even then, as Mr. Malta correctly asserts, to the extent Helis could have identified and prevented the defect, it did so by hiring Hiller. Accordingly, we find no merit this assigned error.

***Trial Court's Allocation of Fault***

Hiller also contends the trial court failed to consider the comparative fault of other parties. La. C.C. art. 2323 states in pertinent part:

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

La. C.C. art. 2323(A). "Since the adoption of a pure comparative fault system, it has been the task of the factfinder to allocate shares of negligence." *Keith v. U.S. Fid. & Guar. Co.*, 96-2075, p. 7 (La. 5/9/97), 694 So. 2d 180, 183 (citing *Socorro*

16

*v. City of New Orleans*, 579 So.2d 931 (La.1991)).

The trial court apportioned 100 percent of the fault to Hiller. It is well-settled that an appellate court reviews a trial court's allocation of fault under a manifest error standard of review. *Watson v. Hicks*, 15-0046-0048, p. 7 (La. App. 4 Cir. 5/27/15), 172 So.3d 655, 663-64 (citing *Beggs v. Harrah's New Orleans Casino*, 14-0725, p. 13-14 (La. App. 4 Cir. 1/21/15)). Therefore, "appellate courts are required to give great deference to the trial court's allocation of fault and that '[o]nly after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award.'" *Id.*, 15-0046-48, p. 7, 172 So.3d at 664 (quoting *Fontenot v. Patterson Ins.*, 09-0669, p. 22 (La. 10/20/09), 23 So.3d 259, 274).

In its written reasons for judgment, the trial court explained the factual basis for apportioning all fault against Hiller, as follows:

> It is undisputed that this accident was the cause of Mr. Malta's injuries. Several expert and fact witnesses testified that all pressurized cylinders, regardless of the reading on the pressure gauge, must be treated as if under pressure. However, the Court finds that the testimony of several witnesses, including the Plaintiff, to be credible in that the Wood Group employees relied upon Mr. Hebert's representations and believed that they were removing and transporting a cylinder that was no longer pressurized. Specifically, Mr. Harvey testified that had Mr. Hebert advised that the gauge could be faulty, and that the cylinder might still be under pressure, he would not have let his employees remove the cylinder.
>
> The Court finds from all of the evidence introduced at trial that Hiller's employee Dray [sic] Hebert's discussion with Wood Group's foreman Lilton Harvey, led directly to the chain of events that resulted in Mr. Malta's injuries, and is at fault for the cause of this accident.

Contrary to Hiller's contention, the trial court did consider evidence of comparative fault. The trial court acknowledged that testimony was presented to establish that it is common practice to treat all cylinders, regardless of the pressure

gauge reading, as if they are pressurized. Having heard the testimony of experts and fact witnesses, including Mr. Malta, the trial court weighed the evidence and made certain credibility determinations. Notably, Hiller's employees are licensed and trained experts, and therefore in the best position to identify hazards associated with the fire suppression system. Mr. Hebert's failure to provide accurate reporting of his findings created the risk Hiller was hired to mitigate. Accordingly, the trial court allocated all fault against Hiller.

We note that while this Court may have apportioned fault differently, we must give deference to the trial court's allocation of fault. Moreover, the Louisiana Supreme Court has held that "[t]he appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently." *Snider v. Louisiana Med. Mut. Ins. Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323 (citing *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La. 4/3/02), 816 So.2d 270, 278-79). For these reasons, we cannot say the trial court's allocation of fault in this case is manifestly erroneous.

### Damages Award

Finally, Hiller contends the trial court's damages award is excessive. "[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La. 1993). Because "[e]ach case is different, . . . the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." *Id.* "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the

18

appellate court should increase or reduce the award." *Id.*, 623 So.2d at 1261.

This Court noted that "[a]n appellate court may not overturn an award for general damages unless it is so out of proportion to the injury that it shocks the conscience." *May v. Reg'l Transit Auth.*, 19-0510, p. 9 (La. App. 4 Cir. 12/30/19), 289 So.3d 195, 202, *writ not considered*, 20-0203 (La. 4/27/20), 295 So.3d 950 (internal citations omitted). "Consideration of prior awards to determine whether a judgment . . . is excessively high is only appropriate after the appellate court has determined that an abuse of discretion has occurred." *Id.* (internal citations omitted).

The trial court awarded Mr. Malta $1,000,000 in general damages for his physical injuries and $350,000 for his psychological injuries. On appeal, Hiller alleges that the trial court's award bears no connection to the evidence relative to Mr. Malta's injuries. Hiller avers Mr. Malta's medical history shows that before the accident he suffered from stress, depression, and back pain. Thus, Hiller argues Mr. Malta should not recover for pre-existing conditions unrelated to the accident.

While Mr. Malta may have suffered previously from back issues, the record reflects that Mr. Malta did seek treatment for his back complaints after the accident. Nothing in the record suggests that his prior back issues caused him to undergo diagnostic testing. However, after the accident, Mr. Malta's back pain was severe enough that he had a diagnostic test performed. In May 2012, a month after the accident, Mr. Malta had an MRI scan of his back. According to spinal surgeon Alexis Waguespack ("Dr. Waguespack"), the scan showed a herniation of the L4-5 disk. At the time, Dr. Waguespack recommended an epidural spinal injection along with pain medication, which Mr. Malta received later that month. When Mr. Malta's condition did not improve, Dr. Waguespack ordered another

19

round of injections. By April 2013, Mr. Malta's condition did not improve and Dr. Waguespack recommended surgery. Mr. Malta had back surgery in May 2013, but continued to suffer back and leg pain. In July 2013, Dr. Waguespack referred Mr. Malta for physical therapy. A functional capacity evaluation in July 2014 determined that Mr. Malta had some permanent physical restrictions, including medium-level duty only and "no lifting greater than 30 pounds, repetitive bending, lifting, stooping, prolonged sitting." Dr. Waguespack also indicated that Mr. Malta could no longer engage in heavy-duty work that he was performing at the time of the accident. In Dr. Waguespack's opinion, Mr. Malta's herniation was related to the April 2012 accident. Dr. Gregor Hoffman, the physician Hiller retained to conduct an independent medical examination of Mr. Malta, agreed that Mr. Malta's herniated disk and shoulder injury were due to the April 2012 accident. Dr. Hoffman also agreed that back surgery was the appropriate course of treatment.

In addition to a back injury, Mr. Malta suffered several fractures in his heel. Mr. Malta testified that he had to wear a compression boot and that recovery for his heel injury took eight to ten months. During this time, he was forced to use a wheelchair because his injuries prevented his ability to use crutches. Mr. Malta testified that he still suffers from foot-related issues. He stated that every day he returns home from work, his foot is swollen. To reduce the swelling, Mr. Malta lies in bed with his foot elevated and uses ice packs. Mr. Malta also suffered a shoulder fracture that required surgery in October 2013.

Further, Mr. Malta suffered emotionally as a result of the accident and his injuries. The record reflects that Mr. Malta suffered from various psychological problems after the accident, including problems with sleep, nightmares, irritability and conflicts with his family, panic attacks, flashbacks (wherein he would focus on

20

the fact that the cylinder could have killed him), and financial worries. Mr. Malta expressed that prior to the accident he was active and had become sedentary. Dr. Angela Traylor, an expert in neurology and psychiatry, diagnosed Mr. Malta with post-traumatic distress order ("PTSD") and major depressive episode and prescribed medication for him. Dr. Traylor indicated that Mr. Malta needed further treatment or counseling. However, Mr. Malta testified that he was unable to continue treatment with Dr. Traylor because the worker's compensation carrier would not approve treatment.

In 2018, Mr. Malta resumed psychotherapy with Dr. Fernando Pastrana, a clinical and neuropsychologist. Dr. Pastrana testified that when he first saw Mr. Malta that Mr. Malta "was in a state of distress, frustrated with the current circumstances" and was seeking assistance managing his stress. Dr. Pastrana indicated that it was unlikely that Mr. Malta's issues with PTSD and related symptoms would resolve on their own. While Mr. Malta was making progress under his care, Dr. Pastrana opined that Mr. Malta would need at least an additional three to five years of treatment. Hiller notes in its brief that while Mr. Malta had "over 26 supportive therapy sessions, . . . [Dr. Pastrana] never diagnosed him with post-traumatic stress disorder." Yet, Dr. Pastrana testified that his work with Mr. Malta was therapeutic and not evaluative. Additionally, Dr. Pastrana "accept[ed] Dr. Traylor's diagnoses."

At trial, Mr. Malta described how he changed after the accident. He testified that he "became very bitter, very angry, treated [his] wife horribly, treated [his] family horribly. [He] just became a monster." He testified that he and his wife married six days after the accident and proceeded with their wedding so as not to lose their deposits. However, they were unable to go on their planned honeymoon.

Mr. Malta described his lifestyle as "very active" before the accident. He owned motorcycles and dirt bikes and riding them was his "passion." Because he experienced too much pain riding his dirt bikes after the accident, he had to sell them. He also testified that he sold his motorcycles because he "had bills to pay."

Mr. Malta's wife testified that before the accident Mr. Malta had never been depressed. She stated that she noticed a "dramatic change" in him after the accident. As his condition worsened over time, she worried that he had become suicidal. At one point, she had him admitted to the hospital for a 12-hour period when she worried he would take his life. She expressed that he has an attitude where "[h]e doesn't care at all about anything."

Considering the nature and extent of the physical injuries Mr. Malta suffered, in addition to the mental and emotional toll the physical injuries took on him, we cannot say the trial court's award of damages is "beyond that which a reasonable trier of fact could assess." *Youn*, 623 So.2d at 1261. Therefore, we find no abuse of the trial court's discretion in its award of damages.

*Answer to Appeal*

In his Answer to the Appeal, Mr. Malta seeks modification of the trial court's amended judgment. With respect to the award for lost wages and past medical expenses, the trial court amended the judgment to indicate that the award was "subject to a credit of amounts previously paid to and received by [Mr. Malta]."[5] Mr. Malta contends that the judgment, as amended, is unclear. The

---

[5] The judgment references an award for not only "los[t] wages" but also "future earning capacity." It makes no distinction as to what portion of the $300,000 award is for lost wages or for future earning capacity. In that a credit is given for what has actually been paid, "subject to a credit for amounts previously paid" refers to those sums paid for lost wages and not future earning capacity. Prior to trial, the parties stipulated that Ace paid worker's compensation benefits to Mr. Malta totaling $241,071.92, of which $99,037.04 was for "indemnity payments." We note, however, that the parties stipulated, prior to trial, that Mr. Malta received $58,474.96 in indemnity from the LHWCA

22

parties stipulated that Mr. Malta received benefits from Ace and Signal Mutual Indemnity Association, Ltd. ("Signal"), which paid wages under a policy of Longshore and Harbor Workers' Compensation Act ("LHWCA") insurance. Although Signal did not intervene in this action,[6] Mr. Malta maintains that the amended judgment could be interpreted as giving Hiller a credit for payments Signal made to him. Therefore, he asks this Court to modify the judgment to state that a credit be given for those "amounts previously paid to, or on behalf of Plaintiff by Ace."

In response, Hiller filed a motion to dismiss Mr. Malta's answer to the appeal. Hiller alleges that Mr. Malta "seeks relief related to the lien held by Signal" and because Signal is not a party to the instant action, Mr. Malta's answer "should not permit a review of the judgment as to an insurer, Signal, which is not in the case or as to issues related to Signal's lien." Hiller, likewise, contends that to "revise the [amended judgment] to prevent any credit against [Mr. Malta's] recovery for Signal's Longshore Act Lien . . . may render Hiller responsible for that lien and thus, assessed double damages, having to pay both [Mr. Malta] and Signal for the same amount."

At the hearing on the motion to alter or amend the judgment, the trial judge noted that he did not intend "to make anybody pay twice." He stated that he "[b]elieved the plaintiff ought to recover once and that the intervenor ought to get paid the money it spent once."

We agree with Hiller that this Court cannot review issues relating to a non-

---

carrier. Thus, of the $300,000 awarded for "los[t] wages and future earning capacity," $142,488 represents an award for future earning capacity (*i.e.*, $300,000-$99,037.04-$58,474.96=$142,488).
[6] Mr. Malta avers that the Signal has notified him that it will require him to repay benefits it paid to him once Hiller pays the judgment. The record does not contain a lien letter or like demand from Signal.

party as to do so would amount to this Court issuing an advisory opinion. *Edward v. Badie*, 19-0332, p. 2 (La. App. 4 Cir. 8/28/19), 282 So.3d 269, 270 ("'courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies'" (quoting *Cat's Meow, Inc. v. City of New Orleans through Dep't of Fin.*, 98-0601, p. 8 (La. 10/2/98), 720 So.2d 1186, 1193). Nevertheless, we find the amended judgment creates some unintended ambiguity; and therefore, we deny Hiller's motion to dismiss Mr. Malta's answer to the appeal.

The amended judgment provides a credit for "amounts previously paid to and received by" Mr. Malta. As to the trial court's award for lost wages, the added language is unambiguous because those wages were paid to him directly. However, as to the award for past medical expenses, we find the added language is ambiguous to the extent that medical expenses may have been paid to medical providers and not to Mr. Malta directly. Therefore, we amend that part of the judgment awarding past medical expenses to provide for "a credit of amounts previously paid to and received by Plaintiff or paid on behalf of Plaintiff." The effect of our amendment is to ensure that Hiller is not required to pay its share of medical expenses and lost wages to Mr. Malta in addition to reimbursing Ace for the very same sums.

Finally, the trial court's amended judgment awards Ace, as the workers compensation intervenor, $241,071.92, the exact amount the parties stipulated Ace paid in benefits for medical expenses and wages. In giving Hiller a credit for sums already paid to or on behalf of Mr. Malta, the sums its owes Ace would be reduced from Mr. Malta's award for lost wages and medical expenses.

## CONCLUSION

24

The evidence presented at trial established that Hiller owed a duty to competently inspect fire safety equipment and accurately report its findings to its client. Mr. Hebert owed this duty to Wood Group when he conducted his inspection at the Black Bay facility. Moreover, Mr. Malta's injuries fell within the scope of Hiller's duty. The evidence further demonstrated that Mr. Hebert breached his duty when he failed to recognize that the cylinder at issue was still pressurized. Consequently, Mr. Hebert's reporting and communicating of his findings misled Wood Group personnel, who believed the cylinder had 0 PSI and therefore, empty. The accidental discharge of a cylinder certified as empty by an expert that causes substantial damage to a person or property is a foreseeable risk. Thus, the trial court could reasonably conclude that, as the expert, Hiller was in the best position to prevent the events that led to Mr. Malta's injuries. Based on the record and the deference this Court gives to the trial court's factual determinations, we find no manifest error in the trial court's allocation of all fault against Hiller.

Further, considering the nature and extent of the physical injuries Mr. Malta suffered, in addition to the mental and emotional toll the physical injuries took on him, we find no abuse of the trial court's discretion in its award of damages. Nevertheless, we amend the trial court's judgment as to the award for past medical expenses to provide for a "credit of amounts previously paid to and received by Plaintiff or paid on behalf of Plaintiff." In all other respects the trial court's amended judgment is affirmed.

## *DECREE*

For the foregoing reasons, the trial court's judgment is affirmed as amended.